UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                            :
YANNSI ESPINAL,                             :
                                            :
                           Plaintiff,       :        17 Civ. 3439 (KPF)
                                            :
                    v.                      :        OPINION AND ORDER
                                            :
AFNI, INC.,                                 :
                                            :
                           Defendant.       :
                                            :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  June 7, 2018

KATHERINE POLK FAILLA, District Judge:

The parties to this putative class action dispute the legality of Defendant AFNI, Inc.'s efforts to collect a debt arising from Plaintiff Yannsi Espinal's unpaid cellular telephone bill. In particular, Plaintiff objects to a letter Defendant sent, dated January 19, 2017, seeking to settle that debt. Plaintiff asserts that Defendant's sending of that letter violated various provisions of the Fair Debt Collection Practices Act ("FDCPA") — to wit, 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(10) — because Defendant did not advise Plaintiff in the letter that actions to collect the debt were time-barred, or that any partial payment might reset the limitations period. Underlying Plaintiff's claims is her belief that the relevant limitations period for actions to collect the debt is two years, as set forth in Section 415 of the Federal Communications Act ("FCA"), 47 U.S.C. § 415.

Pending before the Court are the parties' cross-motions for judgment on the pleadings. The threshold question is whether Section 415 of the FCA

preempts N.Y. C.P.L.R. § 213 ("CPLR"), which establishes a six-year limitations period for breach of contract actions in New York. Plaintiff concedes that Congress did not expressly preempt state law; instead, she argues that field preemption and conflict preemption require this Court to find that Congress implicitly preempted otherwise-applicable state statutes of limitations. Defendant disagrees, arguing that neither field preemption nor conflict preemption applies. Defendant further asserts that, even if the FCA preempted the CPLR, the Court should still deny Plaintiff's motion because Plaintiff has failed to show, as a matter of law, that Defendant's letter violated the FDCPA.

For the reasons set forth below, the Court finds that the FCA does not preempt New York's six-year statute of limitations. The Court therefore grants Defendant's motion for judgment on the pleadings.

## BACKGROUND[1]

### A. Factual Background[2]

Plaintiff maintained an account with AT&T Mobility for cellular telephone service. (Compl. ¶¶ 12-13). She alleges that the telephone was "primarily for personal, family[,] or household purposes[.]" (*Id.* at ¶ 11). She further alleges that she made her last payment on the account sometime before 2014. (*Id.* at

---

[1] For ease of reference, the Court refers to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #25); Plaintiff's memorandum of law in support of her cross-motion for judgment on the pleadings as "Pl. Br." (Dkt. #21); and Defendant's memorandum of law in opposition to Plaintiff's cross-motion as "Def. Opp." (Dkt. #24).

[2] The facts set forth herein are taken from the Complaint ("Compl."), filed on May 9, 2017, and the documents attached thereto. (Dkt. #1).

¶ 14).[3]  On January 19, 2017, Defendant — a corporation that "is regularly engaged, for profit, in the collection of debts allegedly owed by consumers" (*id.* at ¶ 8) — sent a letter to Plaintiff seeking to collect the debt (*id.* at ¶ 17).

The January 19, 2017 letter stated that Plaintiff's "account ha[d] been placed with [Defendant] for collection." (Compl., Ex. 1).  Although the total outstanding balance was $566.19, Defendant was "willing to accept $283.10 to resolve [Plaintiff's] account." (*Id.*).  Upon payment of the discounted balance, Plaintiff's account "w[ould] be closed and marked settled in full with [Defendant] and AT&T Mobility." (*Id.*).  The letter further stated:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid.  If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of the debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification.  If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.  We may furnish information about your account to the credit bureaus.  This is an attempt to collect a debt. … In accordance with the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., [Defendant] is prohibited from engaging in abusive, deceptive, and unfair debt collection efforts, including but not limited to: (i) the use or threat of violence, (ii) the use of obscene or profane language, and (iii) repeated phone calls made with the intent to annoy, abuse, or harass.

(*Id.*).

---

[3]      The Complaint does not specify the date of the last payment, nor does it specify when Plaintiff opened her account with AT&T Mobility.

**B.  Procedural Background**

Plaintiff filed the complaint in this matter on May 9, 2017, on behalf of herself and a putative class of more than 35 similarly situated persons.  (Dkt. #1).  Defendant answered on July 11, 2017.  (Dkt. #7).  On August 2, 2017, the Court held a pre-motion conference to discuss Defendant's anticipated motion for judgment on the pleadings, after which the Court issued a scheduling order directing Defendant to file its motion on September 15, 2017; Plaintiff to file her opposition on October 20, 2017; and Defendant to file its reply on November 3, 2017.  (Dkt. #15).  On August 3, 2017, Plaintiff requested leave to file a cross-motion for judgment on the pleadings, which the Court granted that same day.  (Dkt. #16, 17).  The briefing schedule for Plaintiff's contemplated cross-motion mirrored that for Defendant's motion.  (Dkt. #17).  All parties timely filed their briefs.  (Dkt. #19, 21, 24, 25, 28, 29).

## DISCUSSION

**A.  Applicable Law**

**1.  Motions Under Fed. R. Civ. P. 12(c)**

Courts apply the same procedure to evaluate motions for judgment on the pleadings under Rule 12(c) as for motions to dismiss under Rule 12(b)(6). *Altman* v. *J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *Johnson* v. *Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  Rule 12(b)(6) requires courts to "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648

F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  The non-movant is entitled to relief if he or she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [the non-movant's] claims across the line from conceivable to plausible." (internal quotation marks and citation omitted)).

### 2.    The Federal Communications Act

As noted, the threshold question in this case is whether Section 415 of the FCA preempts the statute of limitations under New York law.  A brief discussion of the statutory language and history of that statute is therefore in order.

Congress enacted the FCA in 1934.  Pub. L. 73-416, 48 Stat. 1064 (codified, as amended, at 47 U.S.C. §§ 151-623).  At the time, AT&T had monopoly power in the telephone service industry.  *See Ting* v. *AT&T*, 319 F.3d 1126, 1130 (9th Cir. 2003).  Congress enacted the FCA to address some of the threats that AT&T's monopoly posed to the market.  *Id.*  The FCA's stated purpose was to "make available ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges[.]"  47 U.S.C. § 151.  To that end, the FCA created the Federal Communications Commission ("FCC"), granting it "broad authority to

regulate interstate telephone communications." *Global Crossing Telecomm.,*
*Inc.* v. *Metrophones Telecomm., Inc.*, 550 U.S. 45, 48 (2007).

> a. **The Filed Tariff Doctrine**

To realize its stated goals, the FCA required carriers to file tariffs for
approval by the FCC. Section 203(a) of the Act stipulated that every common
carrier must file with the FCC "schedules showing … the classifications,
practices, and regulations affecting [the proposed] charges." 47 U.S.C.
§ 203(a). Section 201 specified that "[a]ll charges, practices, classifications,
and regulations … [must] be just and reasonable[.]" *Id.* § 201(b). And
Section 203(c) made it unlawful for a carrier to "extend to any person any
privileges or facilities in such communication, or employ or enforce any
classifications, regulations, or practices affecting such charges, except as
specified in such schedule." *Id.* § 203(c). Once the FCC accepted a tariff, the
carrier was prohibited from offering different rates to consumers. *Id.* "The goal
of these provisions [was] to ensure that all purchasers of communications
services receive[d] the same federally regulated rates." *ICOM Holding, Inc.* v.
*MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir. 2001) (citing *MCI Telecomm.*
*Corp.* v. *AT&T Corp.*, 512 U.S. 218, 229-30 (1994)).

The provisions adopting a filed tariff regime were "modeled after similar
provisions of the Interstate Commerce Act (ICA) and share its goal of preventing
unreasonable and discriminatory charges." *Am. Tel. & Tel. Co.* v. *Cent. Office*
*Tel., Inc.*, 524 U.S. 214, 222 (1998) (citing *MCI Telecomm. Corp.*, 512 U.S. at
229-30). "Indeed, Congress largely copied §§ 1, 8, and 9 of the Interstate

Commerce Act when it wrote the language of Communications Act §§ 201(b) and 207[.]" *Metrophones Telecomm.*, 550 U.S. at 49. In both statutes, the relevant sections "authorize the Commission to declare any carrier charge, regulation, or practice in connection with the carrier's services to be unjust or unreasonable[.]" *Id.* (internal quotation marks and citations omitted).

The FCA, as originally drafted, contained two sections that are of particular relevance to the present action. Section 414 stated that, "Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies." 47 U.S.C. § 414. And in Section 415, Congress established limitations periods for various actions. As originally drafted,[4] it stated:

> (a) All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within one year from the time the cause of action accrues, and not after.

> (b) All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within one year from the time the cause of action accrues, and not after, subject to subsection (d) of this section.

> (c) For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within one year from the time the cause of action accrues, and not after, subject to subsection (d) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the one-year period of limitation said period shall be extended to include one year from the time notice in writing is given by the carrier to the claimant of

---

[4]    As discussed *infra*, Congress later revised the limitations periods in Section 415 to be two years, rather than one.

disallowance of the claim, or any part or parts thereof, specified in the notice.

(d) If on or before expiration of the period of limitation in subsection (b) or (c) a carrier begins action under subsection (a) for recovery of lawful charges in respect of the same service, or, without beginning action, collects charges in respect of that service, said period of limitation shall be extended to include ninety days from the time such action is begun or such charges are collected by the carrier.

\*\*\*

(g) The term "overcharges" as used in this section shall be deemed to mean charges for services in excess of those applicable thereto under the schedules of charges lawfully on file with the Commission.

*Id.* § 415(a)-(d), (g).

### b.    Amendments to the Federal Communications Act

Congress has amended the FCA on various occasions, largely in response to technological and market developments. In 1974, the House of Representatives considered a proposed amendment to Section 415 of the FCA that provided for a two-year statute of limitations period for complaints by consumers against carriers. *See* H.R. Rep. No. 93-1421 (Oct. 3, 1974). The Senate, for its part, proposed to extend the statute of limitations to two years for all actions at law, whether by consumers or by carriers. *See* S. Rep. No. 93-796 (1974). On November 30, 1974, Congress adopted the Senate's version, and thereby extended the statute of limitations to two years for actions by carriers to recover "lawful charges," or by consumers for damages or "overcharges." *See* Pub. L. 93-507, 88 Stat. at 1577-78 (codified as amended at 47 U.S.C. § 415(a)-(c)).

In 1993, Congress amended Section 332 to specify that a provider of commercial mobile services must "be treated as a common carrier for purposes of [the FCA], except for such provisions of [Title II] as the Commission may specify by regulation as inapplicable to that service or person." Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002(b)(2)(A), 107 Stat. 312, 393 (codified as amended at 47 U.S.C. § 332). The amendment provided the FCC with "some degree of flexibility to determine which specific regulations should be applied to each carrier." H.R. Rep. No. 103-213, at 490 (1993). Shortly thereafter, the FCC acted on Congress's invitation, and released commercial mobile radio service providers ("CMRS"), including cellphone companies, from the requirement of filing tariffs. *See* 47 C.F.R. § 20.15. Since then, "CMRS carriers [have] not only [been] exempt from filing tariffs, they are also prohibited from filing tariffs with the Commission." *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17031, 2000 WL 1140570, at *5 (F.C.C. Aug. 14, 2000).

And in 1996, Congress passed the Telecommunications Act, which was codified as interspersed amendments to the FCA and which sought "to provide for a pro-competitive, deregulatory national policy framework ... by opening all telecommunications markets to competition[.]" H.R. Rep. No. 104-458, at 113 (1996) (Conf. Rep.). It directed the FCC to "forbear from applying any regulation" if the FCC determined that:

> [i] enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that communications carrier or

> telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory; [ii] enforcement of such regulation or provision is not necessary for the protection of consumers; and [iii] forbearance from applying such provision or regulation is consistent with the public interest.

47 U.S.C. § 160(a).

The FCC thereafter released "non-dominant interexchange carriers" from the requirement to file tariffs. Notice of Proposed Rulemaking, 11 F.C.C.R. 7,141 (1996). "In the Notice, the Commission tentatively concluded that tariffs were no longer necessary because market forces were sufficient to protect consumers from unjust and unreasonable rates, terms, and conditions." *Ting*, 319 F.3d at 1132 (citation omitted). On October 29, 1996, following a comment period, the FCC issued an order of mandatory detariffing. *See* Second Report and Order, 11 F.C.C.R. 20,730 (1996).

### 3. The Fair Debt Collection Practices Act

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to [e]nsure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The statute "establishes certain rights for consumers whose debts are placed in the hands of professional debt collectors for collection, and requires that such debt collectors advise the consumers whose debts they seek to collect of specified rights." *DeSantis* v. *Comput. Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001). It "generally forbids collectors from engaging in unfair, deceptive, or harassing

10

behavior." *Kropelnicki* v. *Siegel*, 290 F.3d 118, 127 (2d Cir. 2002) (citing 15 U.S.C. §§ 1692-1692p).  Courts "review claims of FDCPA violations under the so-called least-sophisticated-consumer standard in order to: '[i] ensure[ ] the protection of all consumers, even the naïve and the trusting, against deceptive debt collection practices, and [ii] protect[ ] debt collectors against liability for bizarre or idiosyncratic interpretations of collection notices.'"  *Id.* (quoting *Clomon* v. *Jackson*, 988 F.2d 1314, 1320 (2d Cir. 1993)).

### 4.    Preemption

The pending cross-motions turn on the preemptive force *vel non* of Section 415 of the FCA.  The Supremacy Clause of the U.S. Constitution "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough Cty., Fla.* v. *Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (internal quotation marks and citation omitted).  In general, courts have recognized three forms of federal preemption of state law:  express preemption, field preemption, and conflict preemption.  The first — "where Congress has expressly preempted local law," *N.Y. SMSA Ltd. P'ship* v. *Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) — is not at issue here.  Instead, Plaintiff argues that field preemption and conflict preemption apply.  (*See* Pl. Opp. 10-18).

Field preemption and conflict preemption are both instances of implied preemption.  *Goodspeed Airport LLC* v. *E. Haddam Inland Wetlands & Watercourses Comm.*, 634 F.3d 206, 209 n.4 (2d Cir. 2011).  "To establish implied preemption, evidence of Congressional intent to displace state

authority is required." *Id.* at 209 (citation omitted). Indeed, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citation omitted). And where Congress has legislated in a field which the states have traditionally occupied, courts must start "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc.* v. *Good*, 555 U.S. 70, 77 (2008) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Thus, "when the text of a [statute] is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (quoting *Bates* v. *Dow Agrosciences LLC*, 554 U.S. 431, 449 (2005)).

Field preemption exists "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law[.]" *Figueroa* v. *Foster*, 864 F.3d 222, 227 (2d Cir. 2017) (quoting *Town of Clarkstown*, 612 F.3d at 104). As the Supreme Court has noted, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona* v. *U.S.*, 567 U.S. 387, 399 (2012). A court will only find field preemption where the statute "indicates a congressional intent to usurp the entire field[.]" *Brown* v. *Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501 (1984). Congressional intent to "displace state law altogether" may be inferred from a statutory or

regulatory framework "'so pervasive … that Congress left no room for the States to supplement it' or where there is a 'federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399 (quoting *Santa Fe Elevator*, 331 U.S. at 230).

Conflict preemption, the second form of implied preemption, itself contains two branches. The first, known as the impossibility branch, was initially conceived of quite narrowly: Federal law would preempt state law only when "compliance with both federal and state regulations is a physical impossibility[.]" *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.* ("*In re MTBE*"), 725 F.3d 65, 97 (2d Cir. 2013) (quoting *Arizona*, 567 U.S. at 399). More recently, the Supreme Court has "applied a more expansive analysis and found 'impossibility' when 'state law penalizes what federal law requires,'" or when "state law claims 'directly conflict' with federal law[.]" *Id.* (quoting *Geier* v. *Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000)). Yet "[e]ven understood expansively, impossibility preemption is a demanding defense … and we will not easily find a conflict that overcomes the presumption against preemption." *Id.* (internal alteration, quotation marks, and citation omitted).

The second branch of conflict preemption, known as obstacle preemption, applies when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 406 (quoting *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941)). The Second Circuit has characterized obstacle preemption as "only

an intermediate step down the road to impossibility preemption[.]" *In re MTBE*, 725 F.3d at 101. It "precludes state law that poses an 'actual conflict' with the overriding federal purpose and objective." *Id.* (quoting *Mary Jo C.* v. *N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013)). Determining what constitutes a sufficient obstacle is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Mary Jo C.*, 707 F.3d at 162 (internal quotation marks and citation omitted). "The burden of establishing obstacle preemption, like that of impossibility preemption, is heavy[.]" *In re MTBE*, 725 F.3d at 101. "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira* v. *Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). The conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* (internal quotation marks and citation omitted).

## B.   Analysis

It is undisputed that Defendant is a debt collector and that Plaintiff is a consumer for purposes of the FDCPA. The question is whether Defendant committed an FDCPA violation by mailing a collection letter that failed to inform Plaintiff that her debt was time-barred. The question of liability therefore turns on the applicable statute of limitations, and more specifically, whether the two-year statute of limitations under Section 415 of the FCA preempts the six-year statute of limitations under the CPLR. Because Plaintiff

14

concedes that express preemption is irrelevant here (Pl. Opp. 10), the Court considers whether field preemption or conflict preemption applies, and concludes that neither applies.

### 1. Field Preemption Does Not Apply

Field preemption requires Congress to have "legislate[d] so comprehensively in one area as to 'occupy the field.'" *In re MTBE*, 725 F.3d at 97. Put differently, Congress must have created "a framework of regulation 'so pervasive that [it] left no room for the States to supplement it'" or legislated in an area "where a 'federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399 (quoting *Santa Fe Elevator*, 331 U.S. at 230).

A plain reading of the FCA suggests that Congress did not intend to "occupy the field." To begin with, the statute expressly limits the FCC's authority to allow for state regulation. Section 152(b) states that "nothing in this Act shall be construed to apply or to give the Commission jurisdiction with respect to ... charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier[.]" 47 U.S.C. § 152(b). The legislation only provides the FCC with authority to regulate "interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication ... and to the licensing and regulating of all radio stations[.]" 47 U.S.C. § 152(a).

The FCA, in other words, creates a federal-state regulatory partnership. As the United States Supreme Court has explained, the statute "define[s] a national goal of the creation of a rapid and efficient phone service, and [ ] enact[s] a *dual* regulatory system to achieve that goal." *La. Pub. Serv. Comm.* v. *F.C.C.*, 476 U.S. 355, 370 (1986). Numerous provisions expressly reserve authority for state regulators, including, *inter alia*: Sections 224 (pole attachments), 225 (telecommunications relay services), 226 (telephone operator services), 228 (pay-per-call services), 229 (compliance with Communications Assistance for Law Enforcement Act), 251 (interconnection), 252 (negotiation, arbitration, and approval of agreements), and 253 (removal of barriers to entry). The pervasiveness of the dual regulatory structure, with specific authority reserved for State commissions, evidences Congress's intent not to occupy the entire telecommunications field.

So too do the numerous savings clauses that Congress adopted. For example, Section 227 states: "[N]othing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations[.]" 47 U.S.C. § 227. Section 228 states, in relevant part: "Nothing in this section shall preclude any State from enacting and enforcing additional and complementary oversight and regulatory systems or procedures, or both, so long as such systems and procedures govern intrastate services and do not significantly impede the enforcement of this section or other Federal statutes." 47 U.S.C. § 228. And Section 414, which immediately precedes the provision giving rise to the

16

present dispute, states:  "Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies."  47 U.S.C. § 414.

Such clauses "assume[ ] that there are some significant number of common-law liability cases to save."  *Geier*, 529 U.S. at 868.  And courts in this Circuit have consistently held that savings clauses suggest that Congress did not intend to occupy an entire field.  *See Overnite Transp. Co.* v. *Tianti*, 926 F.2d 220, 222 (2d Cir. 1991) (per curiam) ("Congress' intent to allow state regulation to coexist with the federal scheme can be found in § 18(a) of the FLSA, which explicitly permits states to mandate greater overtime benefits."); *see also N.Y.* v. *Hickey's Carting, Inc.*, 380 F. Supp. 2d 108, 116 (E.D.N.Y. 2005) ("This would be akin to field preemption by CERCLA of state common law claims, which is inconsistent with CERCLA's savings clauses[.]"); *Torraco* v. *Port Authority of N.Y. & N.J.*, 539 F. Supp. 2d 632, 643 (E.D.N.Y. 2008) (holding that a savings clause "confirm[s] that Congress did not intend field preemption").

The Ninth Circuit, for its part, has specifically addressed whether Section 414 precludes a finding of field preemption.  It found that "there is no indication that Congress intended every state law cause of action within the scope of the FCA to be preempted.  Congress adopted a savings provision, 47 U.S.C. § 414[.]"  *In re NOS Comm., MDL No. 1357*, 495 F.3d 1052, 1058 (9th Cir. 2007).  As the court went on to explain, "[a] savings clause is fundamentally incompatible with complete field preemption; if Congress intended to preempt the entire field of telecommunications regulation, there

17

would be nothing for [S]ection 414 to 'save,' and the provision would be mere surplusage." *Id.* This Court agrees with the Ninth Circuit's reasoning in *In re NOS Communications*: The express reservation of authority to State regulators, coupled with the inclusion of numerous savings clauses, precludes a finding a field preemption.

Plaintiff herself does not argue — as she must to support a field preemption claim — that the FCA evinces a Congressional intent to occupy the entire relevant field. Although Plaintiff asserts that "Congress originally intended to occupy the field," she states that after the adoption of the 1996 Telecommunications Act and the ensuing detariffing, Congress intended "to maintain at least some degree of control over the field[.]" (Pl. Opp. 12). An intent to maintain "some degree of control" is plainly insufficient to establish field preemption. Instead, Plaintiff must show that "federal law occupies an entire field of regulation and leaves no room for state law[.]" *Figueroa*, 864 F.3d at 227 (quoting *Town of Clarkstown*, 612 F.3d at 104). Plaintiff does not — and cannot — show that the FCA leaves no room for state regulation. Accordingly, the Court rejects Plaintiff's argument that the FCA has field-preemptive effect over state law.

### 2. Conflict Preemption Does Not Apply

Having found that Congress did not intend to "occupy the field," the Court next turns to conflict preemption. Conflict preemption exists "where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal

18

objectives." *Figueroa*, 864 F.3d at 228 (quoting *Town of Clarkstown*, 612 F.3d at 104 (internal quotation marks omitted)). The Court addresses each branch in turn, beginning with obstacle preemption.

### a. The CPLR Limitation Period Is Not an Obstacle to Congress's Purposes and Objectives

Obstacle preemption applies when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 406 (internal quotation marks and citation omitted). Congress's purpose "is the ultimate touchstone" in this analysis. *In re MTBE*, 725 F.3d at 101 (internal quotation marks and citation omitted). And "the conflict between state law and federal policy must be a sharp one[.]" *Id.* (internal quotation marks and citation omitted). "[T]he mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption[.]" *Id.* at 101-02 (internal quotation marks and citation omitted). Put differently, "[t]he heavy burden of overcoming th[e] presumption [against preemption] falls on the party alleging preemption … , who must show that the conflict between the federal and state laws is so direct and positive that the two … cannot be reconciled or consistently stand together[.]" *N.Y. Pet Welfare Ass'n, Inc.* v. *City of N.Y.*, 850 F.3d 79, 86-87 (2d Cir. 2017) (internal quotation marks and citations omitted).

Plaintiff claims that she has met this heavy burden. In her view, Section 415(a) must be read to preempt the CPLR's six-year limitations period. (Pl. Br. 7-13). She begins by citing two principles of statutory interpretation: *First*, "[w]hen terms used in a statute are undefined, we give them their

ordinary meaning," *Asgrow Seed Co.* v. *Winterboer*, 513 U.S. 179, 187 (1995); *second*, the Court must "give effect, if possible, to every clause and word of a statute," *State St. Bank & Tr. Co.* v. *Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) (quoting *Duncan* v. *Walker*, 533 U.S. 167, 174 (2001)). (Pl. Br. 10). Plaintiff suggests that these principles, when applied to Section 415(a), require that the Court read the FCA's statute of limitations to preempt state analogues. (*See* Pl. Opp. 10-12). In her estimation, the meaning of the term "lawful charges" is "plain on its face," and "[t]o adopt Defendant's construction — that 'lawful charges' continues to mean 'tariffed charges' — would render the statute meaningless." (*Id.* at 10-11).

If Section 415(a) were the only relevant statutory provision, Plaintiff's argument might have some appeal. The language of Section 415(a), read in isolation, is indeed quite clear. It states simply: "All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(a). The only condition imposed is that the action must be brought by a "carrier" for the recovery of "lawful charges." Defendant does not dispute that AT&T Mobility is a "carrier" for purposes of the FCA. (*See generally* Def. Opp.). And the ordinary meaning of "lawful charge," when that phrase is read in isolation, is easily ascertainable. "Lawful" is defined as "not contrary to law," or as "permitted or recognized by law." *Lawful*, BLACK'S LAW DICTIONARY (10th ed. 2014). And "charge" is defined as "price, cost, or expense." *Charge*, BLACK'S LAW DICTIONARY (10th ed. 2014). A "lawful charge" is therefore a cost or

expense that is permitted or recognized by law.  The statutory language in Section 415(a) is, as Plaintiff asserts, quite clear.

Yet the United States Supreme Court has explained that, in analyzing a statute, a court "should not confine itself to examining a particular statutory provision in isolation." *Food and Drug Admin.* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  Indeed, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citing *United States* v. *Morton*, 467 U.S. 822, 828 (1984)).  A court must endeavor to "fit, if possible, all parts [of a statute] into an harmonious whole." *F.T.C.* v. *Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959).  And, as Plaintiff herself notes, courts must "give effect, if possible, to every clause and word of a statute." (Pl. Br. 10 (citing *Salovaara*, 326 F.3d at 139)).

When the Court considers the language of Section 415(a) in context, it cannot find that Congress intended for that provision to apply to actions, like the one here, where carriers attempt to collect on consumers' debts for non-tariff charges.  Nor can it find that Congress intended to have the FCA's two-year limitations period preempt state-law statutes of limitations.  Instead, as the Fifth Circuit found in *Castro* v. *Collecto, Inc.*, a plausible — and indeed, compelling — reading of the phrase "lawful charges" in Section 415(a) suggests that Congress intended the provision to apply only to attempts to recover tariffed charges that are filed with, and approved by, the FCC.  634 F.3d 779,

21

786-87 (5th Cir. 2011). While the Court need not, and does not, adopt the entirety of the *Castro* Court's decision, it agrees with the holding that "it is … reasonable to read 'lawful charges' in § 415(a) as a term of art meaning only tariffed charges." *Id.* at 786.

Section 415 contains six subsections, four of which are directly relevant to the present analysis. Subsection (a) establishes the limitations period for actions at law by carriers to recover "lawful charges"; subsection (b), the limitations period for complaints by consumers for the recovery of damages not based on overcharges; and subsection (c), the limitations period for actions at law by consumers to recover "overcharges." 47 U.S.C. § 415(a)-(c). The statute therefore discusses separately the limitations periods applicable to actions by carriers for "lawful charges," on the one hand, and to actions by consumers for "damages" and "overcharges," on the other.

Although the statute does not define "lawful charges," it does define "overcharges." Subsection (g) defines the term as: "charges for services in excess of those applicable thereto *under the schedules of charges lawfully on file with the Commission*." 47 U.S.C. § 415(g) (emphasis added). Therefore, when Congress set a limitations period for actions that consumers might bring against carriers for overcharges, it did so in relation to the tariffs filed with the FCC. The fact that "overcharges" is defined in reference to the tariff regime permits a plausible reading of "lawful charges" as similarly tied to the tariff regime. After all, Congress used the term "legal charges" in contrast to "overcharges": the latter signified charges above the approved tariffs; the

former, it stands to reason, charges at or below the tariffs.  Given this relationship between the terms, it is at least plausible that Congress intended both terms to be understood in relation to the tariff regime.  That is particularly so, given that the tariff regime formed the regulatory backdrop at the time Congress adopted the language presently in Section 415.

Plaintiff resists this conclusion by arguing that Congress's failure to amend Section 415 "[d]espite the passage of more than twenty (20) years since the FCC began detariffing telephone carriers in 1993" is compelling evidence of Congress's intent to have Section 415(a) apply to all actions, not just those based on the tariffed charges.  (Pl. Br. 11).  It is true that, "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally[.]"  *Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citing *EEOC* v. *Arabian Am. Oil Co.*, 449 U.S. 244, 256 (1991)).  Yet it is also true that when "Congress has not comprehensively revised a statutory scheme … '[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional [intent].'"  *Alexander* v. *Sandoval*, 532 U.S. 275, 292 (2001) (quoting *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989)).

The question, then, is whether Congress's failure to amend the term "lawful charges" in Section 415 is sufficient evidence of Congress's intent to give preemptive effect to the FCA's statute of limitations.  This Court cannot find that it is.  Congress's failure to amend Section 415 does not evince an intent to expand the historical meaning of the phrase "lawful charges" to

include non-tariff charges, much less to have the FCA's statute of limitations preempt state-law limitations periods.  Plaintiff bears a "heavy burden" in attempting to show a "conflict between the federal and state laws … so direct and positive that the two … cannot be reconciled or consistently stand together[.]"  *N.Y. Pet Welfare Ass'n*, 850 F.3d at 86-87 (internal quotation marks and citations omitted).  Plaintiff has not met that burden, and Congress's failure to amend Section 415 is insufficient evidence of Congressional intent to permit a finding to the contrary.

The Court is similarly unconvinced by Plaintiff's argument that to read "lawful charges" as "tariffed charges" would render the statutory text moot.  (Pl. Br. 11).  Although the FCC has released some carriers from tariff-filing requirements, other carriers — including competitive local exchange carriers — are still subject to that requirement and, by extension, to Section 415.  *See, e.g.*, *N. Valley Comm., LLC* v. *F.C.C.*, 717 F.3d 1017, 1019 (D.C. Cir. 2013).  Accordingly, the Court cannot find that conflict preemption applies.

### b.    The CPLR Does Not Directly Conflict With the FCA

The Court next considers the impossibility branch of conflict preemption, which applies "where it is impossible for a private party to comply with both state and federal requirements[.]"  *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287 (1995) (internal quotation marks and citation omitted).  It requires "physical impossibility — *e.g.*, if federal law says do X, and a state law says *do not* do X."  *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 739 F. Supp. 2d 576, 595 (S.D.N.Y. 2010).  Put differently, impossibility exists where

"state law penalizes what federal law requires," *Geier*, 529 U.S. at 873, or where state law claims "directly conflict" with federal law, *Cent. Office Tel.*, 524 U.S. at 227. "Even understood expansively, '[i]mpossibility preemption is a demanding defense,' … and we will not easily find a conflict that overcomes the presumption against preemption." *In re MTBE*, 725 F.3d at 97 (internal citation omitted).

Plaintiff has not shown that the FCA and the CPLR directly conflict or that it would be impossible to comply with both. The Court's analysis of conflict preemption — and, in particular, of the plausible reading of "lawful charges" as applying only to tariffed charges — suggests that there is no direct conflict between the FCA and the CPLR. As the Second Circuit has stated, "[o]bstacle preemption … appears to [be] only an intermediate step down the road to impossibility preemption[.]" *In re MTBE*, 725 F.3d at 101. Having already found that the CPLR does not present an obstacle, because Section 415 does not apply to the Defendant's efforts to collect Plaintiff's debt, this Court easily finds that the two statutes do not directly conflict.

The CPLR does not penalize what the FCA requires, nor does the FCA penalize what the CPLR requires. Even if Section 415 applied to actions involving consumer debts for non-tariffed charges — which it does not — the carriers (or the debt collectors) could comply with both the FCA's two-year limitations period and the CPLR's six-year limitations period. Here, Plaintiff does not suggest that there were legal, physical, or other constraints that would have made it impossible for Defendant to send the collection letter

25

within two years of Plaintiff's final payment, and thereby to have complied with both limitations periods.  (*See generally* Pl. Br.).  For that reason, the Court cannot find that impossibility preemption applies.  *See Witco Corp.* v. *Beekhuis*, 38 F.3d 682, 688 (3d Cir. 1994) (finding that preemption was not appropriate where "[t]he provision in the [state statute] fixing an eight-month period for filing a claim against an estate and the three-year period for making a claim for contribution under CERCLA, are not mutually exclusive"); *Draper* v. *Chiapuzio*, 9 F.3d 1391, 1394 (9th Cir. 1993) ("Because it is physically possible to comply with both Oregon's one-year notice-of-claim requirement and the Act's two-year statute of limitations … the Act does not preempt Oregon's notice-of-claim requirement.").

The Second Circuit's decision in *Marsh* v. *Rosenbloom* is instructive.  499 F.3d 165 (2d Cir. 2007).  There, the Court examined whether a six-year federal statute of limitations preempted a Delaware statute that imposed time limits on the capacity of dissolved corporations to be sued.  *Id.*  It found that federal law did not preempt state law because "it is certainly possible to comply with the [federal] limitations period and Delaware's limits on the amenability to suit of dissolved corporations and their shareholder-distributees."  *Id.* at 178.  It noted that as long as a "plaintiff files its claim within three years of the corporation's dissolution as required by [Delaware law] … it also meets [the federal] six-year limitations period[.]"  *Id.*  Finally, it explained:  "That a … plaintiff, like the State here, might find it impossible to comply with both statutes in some circumstances is not enough to establish an actual conflict between the two in

this case." *Id.* So too here: Carriers could comply with both the FCA and the CPLR by bringing any claims within two years of the events giving rise to the actions. The Court therefore finds that impossibility preemption does not apply.

## CONCLUSION

For the reasons stated above, Defendant's motion for judgment on the pleadings is GRANTED, and Plaintiff's cross-motion for judgment on the pleadings is DENIED.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  June 7, 2018
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge